Exhibits (attached to Affidavit of Laird J. Heal)

Exhibit 1. Email message from Peter Martel, Monday, March 23, 2026, 8:15 PM.
Exhibit 2. MFS Safety Policy
Exhibit 3. Email message from Peter Martel, Monday, February 23, 2026.
Exhibit 4. Email message from Peter Martel, Tuesday, February 24, 2026.
Exhibit 5. Neurophsychological Assessment", Brian Dessureau, December 2, 2015

Certificate of Service

I, Laird J. Heal, certify that I am over the age of 18 and on this date I have served this above Motion upon the Defendant, by placing in the United States Mail, postage prepaid, to:

Lisa Sieverts
175 Brickyard Road
Nelson NH 03431

Larry Ames
227 Greenfield Road
Francestown NH 03442

Matt Garland
220 N. Shore Road
Munsonville NH 03431

Valerie van Meier
9 Log Cabin Road
Nelson NH 03303

7 Nelson Common Rd
Nelson NH 03450

Town of Peterborough
1 Grove Street
Peterborough NH 03457

Bruce Myrick
54 Brook Street
Keene NH 03440

Peter Martel
68 S. Bennington Road
Bennington NH 03457

Perin Ellsworth-Osanya
46 Pinehurst Avenue
Keene NH 03457

Bill Potter
634 Deer Meadow Road
Webster NH 03431

Town of Harrisville
705 Chesham Road
Harrisville NH 03450

Lakefalls Lodge
750 Aten Road
Munsonville

Christopher Salmon
375 Keene Road
Antrim NH 03043

Owen Hale
75 Murdough Hill Road
Nelson NH 03457

Tom Buttrick
9 Log Cabin Road
Nelson NH 03457

Kim Wallach
43 Hurricane Rd
Keene NH 03457

Harrisville School Board
235 Chesham Road
Harrisville NH 03458

Laird J. Heal

Exhibits

Exhibit 1. Email message from Peter Martel, Monday, March 23, 2026, 8:15 PM
Exhibit 2. MFS Safety Policy
Exhibit 3. Email message from Peter Martel, Monday, February 23, 2026
Exhibit 4. Neurophsychological Assessment", Brian Dessureau, December 2, 2015

Certificate of Service

I, Laird J. Heal, certify that I am over the age of 18 and on this date I have served this above Motion upon the Defendant, by placing in the United States Mail, postage prepaid, to:

Lisa Sieverts
175 Brickyard Road
Nelson NH 03431

Larry Ames
227 Greenfield Road
Francestown NH 03442

Matt Garland
220 N. Shore Road
Munsonville NH 03431

Valerie van Meier
9 Log Cabin Road
Nelson NH 03303

7 Nelson Common Rd
Nelson NH 03450

Town of Peterborough
1 Grove Street
Peterborough NH 03457

Bruce Myrick
54 Brook Street
Keene NH 03440

Peter Martel
68 S. Bennington Road
Bennington NH 03457

Perin Ellsworth-Osanya
46 Pinehurst Avenue
Keene NH 03457

Bill Potter
634 Deer Meadow Road
Webster NH 03431

Town of Harrisville
705 Chesham Road
Harrisville NH 03450

Lakefalls Lodge
750 Aten Road
Munsonville

Christopher Salmon
375 Keene Road
Antrim NH 03043

Owen Hale
75 Murdough Hill Road
Nelson NH 03457

Tom Buttrick
9 Log Cabin Road
Nelson NH 03457

Kim Wallach
43 Hurricane Rd
Keene NH 03457

Harrisville School Board
235 Chesham Road
Harrisville NH 03458

Laird J. Heal

Exhibits

Exhibit 1. Email message from Peter Martel, Monday, February 23, 2026, 8:15 PM.
Exhibit 2. MFS Safety Policy
Exhibit 3. Email message from Peter Martel, Monday, February 23, 2026.
Exhibit 4. Email message from Peter Martel, Tuesday, March 24, 2026.
Exhibit 5. Neuropsychological Assessment", Brian Dessureau, December 2, 2015

Exhibit 1

# Exhibit 1

Subject: Moratorium
From: DBG <dancingbrook@gmail.com>
Date: 2/23/26, 1:29 PM
To: Laird Heal <lairdheal@yahoo.com>

Dear Bud,

Thank you for speaking with me today. I wanted to reach out personally rather than simply send a letter, and I appreciate you taking the call. This follow-up is my written record of the most import parts of what we discussed.

I want to acknowledge again that this may be hard to sit with, and may feel unfair. That complexity is not lost on me, and this decision did not come without genuine care.

As I shared, after receiving and reviewing multiple concerns from community members — people who expressed feeling uncomfortable at our events — the board has voted to place an indefinite moratorium on your participation in all events we sponsor or organize, effective today. This includes our Monday night dances, the Peterborough Dance, our concerts, the Morris dance troop, and any other Monadnock Folklore Society events or activities.

This decision reflects the board's responsibility to maintain an environment where all participants feel safe and welcome, including you. I am not prepared at this time to define conditions or a timeline for revisiting it beyond an initial outreach within two to four weeks.

We ask that during this period you refrain from contacting other members of our dance community directly. If you wish to communicate with the board, please do so in writing through me — keeping communication through a single channel helps ensure clarity for everyone.

The board has committed to seeking guidance on this and broader community and cultural issues we are navigating, and that work is ongoing.

Your long history with this community is recognized. We did not arrive here without reflection. This moratorium is not a verdict on who you are.

Sincerely,

Peter Martel

Board Member

Monadnock Folklore Society

Exhibit 2

# Exhibit 2

# Safety Policy at MFS Contra Dances

**Safety Policy**

Monadnock Folklore Society approved 09/07/25

**Introduction**

The Monadnock Folklore Society is dedicated to sponsoring events that are safe and enjoyable experiences for all attendees.

We encourage you to assist us by modeling actions that make you and those around you feel comfortable and safe, asking others about their needs and preferences, and being open and communicative about your own needs and preferences.

MFS is committed to doing the best we can. We are open to feedback on how we can continue to improve.This is a living document and will be updated as needed.

Contact a dance organizer, or send email to contrainfo@monadnockfolk.org to report a violation of this safety policy.

**Statement of Community Care**

Inclusion: We are welcoming to all, of any sex, gender identity and expression, age, sexual orientation, contra dance experience, disability, physical appearance, body size, race, ethnicity, or religion. We actively work to create inclusive spaces.

Consent: Anyone can say yes or no when asked to dance, with no reason needed for declining. It's fine to say no to a dance with one person and yes to someone else. Ask for consent before initiating a flourish such as a twirl or spin. We encourage clear communication between dancers about what feels safe and comfortable.

Accommodation: We encourage dancers to inform and ask each other about any personal limitations and to accommodate each other as needed, graciously.

Safety: We dance with the safety and comfort of other dancers in mind. There is a fine line between being playful and interfering with others. Each dancer has both the right and the responsibility to maintain control of their body. We do not lift another dancer off the floor. We do not dip people without their explicit permission. Note that it is possible to harm someone accidentally and it's up to each dancer to be aware of how others are reacting to their touch. Someone pulling away or saying "Ow" are as important to notice as being told specifically that you caused harm.

Respect: We respect each other. We believe that each attendee has something valuable to offer. We trust that all attendees will show mutual respect.

Roles: Anyone can dance with anyone. Some folks dance one role for a whole evening; others switch back and forth. We trust that the dancer coming toward us in the contra line is dancing the role they chose.

**Unacceptable Behaviors**

- Harassment: offensive behavior related to, but not limited to, discrimination on the basis of sex, gender identity and expression, age, sexual orientation, disability, physical appearance, body size, race, ethnicity, or religion.
- Unwanted or sexualized touching
- Insisting on partnering or continued asking after the other person has said "no"
- Insisting on flourishes after the other person has indicated they do not want to
- Lifting the other person such that their feet leave the floor
- Dancing while inebriated. Monadnock Folklore Society dances are smoke, drug, and alcohol-free.
- Stalking
- Hitting or other on-purpose physical harm
- Weapons are not permitted at our events. "Weapon" is defined as any firearm or other object that has been designed to inflict bodily harm or physical damage to property. Dance organizers have discretion to interpret this definition, and to ask an attendee to leave or remove the weapon from the property.
- Criminal activity, theft, vandalism

The MFS Board has the right to permanently ban someone from Monadnock Folklore Society events if the Board believes they pose a threat or harm to the community.

**Appeal Process**

A person who has raised a concern,, or the subject of a concern, may submit a request in writing for a review of any action taken to resolve a concern. The request should include any new information provided by any party that is relevant to the initial concern. If any agreements were made to resolve a concern, the person making the appeal should detail how the agreements have been completed.

The organizers will attempt to resolve all reported concerns but do not promise specific outcomes.

**Additional Policies**

Photography

Photographers may be present at dances. Consent to be photographed or recorded is assumed. However, any attendee has the right to tell a photographer or dance organizer that they do not wish to be photographed, and their request must be honored.

Exhibit 3

# Exhibit 3

Case 1:26-cv-00263-JL Document 1-4 Filed 04/07/26 Page 12 of 24

Subject: Monadnock Folklore Society Activities
From: Peter Martel <dancingbrook@gmail.com>
Date: 3/23/26, 8:15 PM
To: Bud <lairdheal@yahoo.com>

Laird,

Your showing up tonight was not OK. To make it very clear, until further notice, you are not allowed to come to Monadnock Folklore Society-related activities. I know it is not easy, but that was our decision and it remains that way.

If you show up, you will be told to leave every time. I assume you know we could take more substantial action, but we are trying to avoid that, and I hope you can respect that.

Your showing up without a clear written indication from me or the Board President saying it is OK only makes resolution more difficult.

Thank you for respecting that decision going forward,

Peter

Exhibit 4

# Exhibit 4

Case 1:26-cv-00263-JL Document 1-4 Filed 04/07/26 Page 14 of 24

Subject: Re: Monadnock Folklore Society Activities
From: DBG <dancingbrook@gmail.com>
Date: 3/24/26, 10:48 AM
To: Laird Heal <lairdheal@yahoo.com>

Laird,

From my original note (dated 2/23/26):

> ...the board has voted to place an indefinite moratorium on your participation in all events we sponsor or organize, effective today. This includes our Monday night dances, the Peterborough Dance, our concerts, the Morris dance troop, and any other Monadnock Folklore Society events or activities.
>
> This decision reflects the board's responsibility to maintain an environment where all participants feel safe and welcome, including you. I am not prepared at this time to define conditions or a timeline for revisiting it beyond an initial outreach within two to four weeks.

I have communicated with you several times over the last four weeks, and never indicated the moratorium had been lifted. I had hoped a period of distance would be helpful for everyone, but that benefit has been difficult to realize given the various interactions, including last night.

My objective was to be able to spend the board time sorting out how best to deal with this situation in a way that was constructive and useful for all involved. Instead, much time has been spent dealing with additional issues related to your interactions since Feb. 23.

At our meeting on Sunday, there was no decision to lift the moratorium, but we will be pursuing further strategies for how to deal with similar situations.

Instead of pursuing an appeal at this time, I'd again encourage you to give us all a break from interactions that add to our burden. Using that time to contemplate what you might do differently would also allow us to focus on finding strategies that benefit everyone involved.

I will inform the board that you wish to appeal. From our policy:

> A person who has raised a concern, or the subject of a concern, may submit a request in writing for a review of any action taken to resolve a concern. The request should include any new information provided by any party that is relevant to the initial concern. If any agreements were made to resolve a concern, the person making the appeal should detail how the agreements have been completed.

Case 1:26-cv-00263-JL Document 1-4 Filed 04/07/26 Page 15 of 24

The organizers will attempt to resolve all reported concerns but do not promise specific outcomes.

For your sake, from me as an individual, not as a board member, I strongly encourage you to:
— Stop testing the boundaries of the board's decision.
— Instead of finding exceptions to what has been shared, look instead at what concerns have been expressed, and what you have also shared back that actually adds to our concerns.
— If you wish to appeal, you might first identify and acknowledge the concerns shared that led to this decision, followed by what you will do differently.

Sincerely,

Peter

'...the slimmest of instructions, "To use your gifts and dreams for good." '
— From Braiding Sweetgrass by Robin Wall Kimmerer

> On Mar 24, 2026, at 12:51 AM, Laird Heal <lairdheal@yahoo.com> wrote:

> In your "DBG" email (no subject, 3/12/2026, 8:10 PM) you said that the MFS Board would meet on 3/22. Owen Hale described that item was to decide on further sanctions.
>
> I had every right to expect that no further sanctions were imposed because I heard nothing. In your "Peter Martel" email ("Re: Moratorium", 3/13/2026, 5:44 AM) you said that you did not want to "continue with the conversation". Thus, there was only one way to find confirmation, i.e., in person.
>
> Your dialogue last night was disjointed at times. You accused me of not waiting for four weeks, while the 3/13 email message recognized that I was cooperating with four weeks: starting on February 23, 2026, ending on March 22, 2026.
>
> It looks like that on Monday you ejected me from the Nelson Town Hall on your own, or possibly with the "Board President".
>
> The "Safety Policy" guarantees an "Appeal Process" but nothing of the like has been accorded me. Please advise all concerned that I should be allowed to appeal.

Peter Martel wrote:

> Laird,
>
> Your showing up tonight was not OK. To make it very clear, until further notice, you are not allowed to come to Monadnock Folklore Society-related activities. I know it is not easy, but that was our decision and it remains that way.
>
> If you show up, you will be told to leave every time. I assume you know we could take more substantial action, but we are trying to avoid that, and I hope you can respect that.
>
> Your showing up without a clear written indication from me or the Board President saying it is OK only makes resolution more difficult.
>
> Thank you for respecting that decision going forward,
>
> Peter

Exhibit 5

# Exhibit 5

UMassMemorial

Patient Name: LAIRD HEAL
Encounter Date: Oct 29 2015 1:05PM
BRIAN DESSUREAU Ph.D.

DOB: 05/14/1955
MRN: 520109936

## NEUROPSYCHOLOGICAL ASSESSMENT

REASON FOR REFERRAL: Mr. Laird Heal experienced a left posterior temporal lobe stroke on 01/28/14 and was referred by Richard Goddeau, DO for neuropsychological evaluation in order to evaluate his current cognitive abilities and help determine his fitness to return to work as a lawyer.

BACKGROUND INFORMATION: Mr. Heal is a 60 year-old, right-handed man with a medical history notable for left posterior temporal lobe stroke. On 01/28/14, Mr. Heal was transported by EMS to the UMass Memorial Medical Center emergency department where he displayed pronounced expressive and receptive aphasia. He underwent a CT scan in the emergency department which revealed a questionable small focus of developing infarction in the left posterior temporal lobe and a left middle cerebral artery occlusion/embolus. Over the course of this admission, he was also diagnosed with cardiomyopathy, arrhythmia, hospital acquired pneumonia, fever, a thyroid nodule, and pleural effusion. At the time of discharge, he continued to experience pronounced aphasia.

Mr. Heal participated in occupational and speech therapy during his hospitalization; however, his therapy was not continued after discharge. Mr. Heal stated that because his speech difficulties have persisted and interfered with his work, he very recently resumed speech therapy. Mr. Heal reported that his language difficulties are his primary concern. He described having particular difficulty hearing and understanding numbers and days of the week. He also described expressive difficulties in which he stammers and becomes stuck saying one sound of a word. He offered the example that he was trying to say "Mañana" to a colleague and he could only say "n-n-n-n" repeatedly. He also reported being able to visualize words but being unable to effectively produce them vocally. This was observed during the testing session where he could spell a word aloud, but could not pronounce the word. Mr. Heal reported that his basic reading abilities have not been affected, but he is no longer able to "speed read". He described his organizational skills as being affected by the stroke, while his memory, ability to navigate while driving, and attention are unaffected.

Mr. Heal reported that since his discharge from the hospital in early 2014, he has discontinued taking his prescribed medication against his physician's advice. He described his reason for doing so by saying that while his physician's focus was on preventing another stroke through medication, the side effects of these medications were adversely affecting his greater well-being. Mr. Heal reported that he has always preferred to avoid doctors, even prior to his stroke. Medical records indicate that he experienced a decline in his overall health beginning around August

2013, which included decreased exercise tolerance, shortness of breath, and heart palpitations. During the interview, Mr. Heal reported that he had also been experiencing ongoing cardiac problems, which had required extensive medical workup; however, Mr. Heal reported that these problems have now completely resolved, which he believes to be related to the fact that he has stopped storing his mobile telephone in his left breast pocket. He reported no history of transient ischemic attacks (TIAs), concussions, seizures, or other major health problems.

Mr. Heal reported that his mood has declined in recent years, though he made a point to clarify that he is not depressed. When asked about finding joy in his daily life, he stated "I'm not as much fun as I used to be". He also reported that he used to "love every minute" of computer programming in the past, and he now tends to "hate every minute" of it. He reported having no relationship with his children since his divorce, which has been quite saddening to him. Mr. Heal reported that he does not experience thoughts of suicide. He reported that he has never undergone mental health treatment, with the exception of therapy that he described as being in some way required during his divorce.

Mr. Heal reported that he earned an undergraduate degree in mathematics and worked as a computer programmer from 1976 to 2001. He earned a law degree in the 80s and has practiced civil law where he worked to "keep people in their homes". He reported that he was suspended from practicing law after his stroke. He has continued to remain active doing consulting work but is not currently offering legal opinions. While Mr. Heal initially reported that he was capable of returning to work as a lawyer, he later explained that he felt as though he would instead be best suited for returning to programming.

<u>BEHAVIORAL OBSERVATIONS</u>: Mr. Heal arrived approximately 15 minutes late to the first appointment and was unaccompanied. For his second appointment, he mistakenly arrived at 9:00am when his appointment was scheduled for 1:00pm. He walked without assistance and had a somewhat stiff gait. His fine motor skills were grossly intact. He appeared somewhat unkempt with messy, untrimmed hair. He wore a dress shirt which was very tight around his belly. Mr. Heal maintained appropriate eye contact. He reported that he did not require corrective eyewear or hearing devices. Mr. Heal was alert and oriented to person, place, and time, and could accurately name current political figures. His speech was generally stilted, effortful, low in volume, and slow in pace. He produced a number of phonemic and semantic paraphasias, and he mispronounced known words. Mr. Heal was aware of when he had made an error and was usually able to correct the error if given the time. His tone of speech was generally lacking strong inflection. His speech production was less than expected given his profession and education level; however, he answered questions fully and was able to elaborate on certain topics when prompted. The content of his speech was generally appropriate, and he often filled time between tests with short personal anecdotes. His affect during the interview was somewhat

blunted though euthymic. His facial expressions were minimal, however, he smiled and joked occasionally. Mr. Heal understood the directions for each test and very rarely needed clarification. Mr. Heal displayed strong attentional focus, persisted during testing, and displayed good effort. The following test results are likely an accurate reflection of his current cognitive abilities.

## ASSESSMENT RESULTS

General Intellectual Functioning: Based on Mr. Heal's self-reported ability, his educational and professional level, and his performance on several subtests of an intelligence measure, his premorbid general intellectual functioning is likely at least high average. Mr. Heal reported during the interview that since an early age, he performed intellectually at a level that exceeded that of his peers. He stated that he was often bored and not challenged by schoolwork. Additionally, Mr. Heal's education level (Juris Doctorate) and work as both a computer programmer and attorney further support the notion that he possesses well-developed intellectual abilities. Formal intelligence testing revealed above average performance. His verbal skills ranged from above average to superior, with slightly better performance on a task requiring verbal abstract reasoning than a measure of general word knowledge. He performed in the superior range on both a measure of visuospatial construction abilities and a measure of spatial pattern recognition. His performance on tests of working memory, or his ability to attend to, remember, and manipulate verbally presented information, was variable with performances ranging from the moderately impaired to high average range. A test of processing speed was average.

Attentional Functions: Mr. Heal scored in the average range on both a measure of rapid visual motor scanning speed and on a test of visuomotor processing and attention. His ability to repeat a verbally presented series of numbers was moderately impaired overall; however, his performance improved on more challenging sets of items within this test, suggesting he may have modified his strategy on latter portions of the measure after realizing the difficulty of the task. Performance indicators on a test of sustained attention requiring that he visually attend to letters flashed on a computer screen over a long period of time were not significantly elevated and his performance was consistent with a nonclinical profile (Confidence Index = 67%). In general, Mr. Heal's abilities related to attention were somewhat variable with scores ranging from moderately impaired to average. Any impaired scores are very likely representative of a decline from his previous abilities, and it is also quite possible that his average performance on other measures of attention also represent a decline as compared to his very strong premorbid abilities.

Language Functions: During the test session, Mr. Heal demonstrated a number of difficulties related to expressive language. He struggled to produce language fluently and to express

thoughts and ideas in a succinct and clear way. Mr. Heal's insight into his difficulty was variable. He showed a full awareness of his difficulty with word finding and expressing specific words. He seemed less aware of his difficulty with expressing ideas clearly or telling stories in an articulate way. Formal testing of language abilities revealed that, despite his expressive difficulties, his word knowledge and verbal abstract reasoning skills are in the above average and superior ranges respectively,indicating that his verbal knowledge is fully intact. Similarly, while Mr. Heal struggled to form specific sounds in naming visually presented pictures, when given time he was ultimately able to express the correct word and scored in the high average range. His performance on a test of written language that required him to write a brief description of a picture revealed average performance. His ability to read a short passage aloud revealed mildly impaired accuracy and mildly to moderately impaired fluency. A measure of his ability to repeat words and phrases revealed phonemic and semantic paraphasic errors, which he was immediately aware of and able to correct given enough time. On tests of verbal fluency, Mr. Heal performed in the average range on both semantic and phonemic measures. The speed at which he was able to rapidly switch between two semantic categories of words was low average with average accuracy. Mr. Heal's receptive language skills appeared to be grossly intact based on his ability to understand and follow spoken directions during testing, and his ability to complete a task requiring increasingly difficult oral commands.

<u>Visuospatial and Motor Functions</u>: The prorated index of Mr. Heal's visuospatial and motor abilities fell in the superior range, based on his ability to quickly reproduce visual designs with blocks and to identify spatial and conceptual patterns. Similarly, he was able to accurately draw the face of a clock and draw hands set to a specific time. His ability to accurately copy a complex, detailed figure was in the moderately impaired range though this appeared more due to carelessness regarding the details than primary visuospatial impairment. A test of his fine motor abilities, which required him to place small pegs into holes, revealed severely impaired abilities in his dominant right hand and low average performance in his left hand. These right-handed fine motor difficulties may be reflective of his left hemisphere stroke.

<u>Learning/Memory Functions:</u> On a measure of immediate recall for a list of 15 random words, Mr. Heal recalled four words after the first trial which falls in the mildly impaired range. His score improved over the course of four subsequent trials (4, 7, 9, 8, 12) resulting in overall learning that fell into the low average range. He scored in the high average range on a test of immediate recall for an orally presented story. His immediate recall for a number of individually presented visual stimuli was average, while immediate recall for a single complex stimulus was low average. His delayed recall was low average for the random list of words, above average for the story, and average for both individual designs and the single complex figure. In general, he learned and retained verbal information more easily when the information contained inherent structure (such as in the form of a story) as opposed to information without structure (random

words). Overall, Mr. Heal's ability to learn and retain information is slightly lower than expected given his intellectual abilities.

Executive Functions: Mr. Heal demonstrated average to superior abilities on tasks requiring him to plan ahead, think flexibly, and monitor his behavior. On a test of visual planning requiring him to efficiently construct towers while following specific rules, he demonstrated superior speed, accuracy, and self-monitoring ability. He performed in the high average range on a measure which required that he make guesses about the inexplicit rules of the task based on limited feedback. He scored in the average range on tests of phonemic and semantic fluency. He scored in the low average range on a separate test of fluency which required that he quickly alternate between two categories of words. A test of his ability to quickly recite the days of the week and months of the year in various orders (e.g., forwards, backwards, etc.) was mildly impaired due to general slowing in his verbal output and minor errors which were likely related to difficulty with expressive speech (e.g. Mr. Heal fumbled over the letters "U" and "V" while reciting the alphabet). His ability to alternate between numbers to letters in ascending order was average. His ability to draw a clock with hands set to a specified time was average.

Affective Functions: During the interview, Mr. Heal denied experiencing depression; however, he reported that his mood has declined in recent years as a result of his divorce and lack of a close relationship with his children. He reported experiences consistent with anhedonia; where he used to "love every minute" of computer programming, he now "hates every minute". Though he reported changes in mood and mild depressive symptoms, it is not likely that his affective functioning has an appreciable impact on his cognitive abilities.

## SUMMARY/DISCUSSION

Reason for Referral: Mr. Laird Heal is a 60 year-old, Caucasian man who experienced a left posterior temporal lobe stroke on 01/28/14. Richard Goddeau, DO referred Mr. Heal for neuropsychological evaluation in order to assess his current cognitive abilities and help determine his fitness to return to work as a lawyer.

Summary of Test Results: The results of the test battery along with Mr. Heal's self-reported abilities, his educational attainment, and his professional accomplishments suggest that he is of at least high average intellectual functioning. Mr. Heal's attentional abilities ranged from moderately impaired to average. Mr. Heal demonstrated difficulty with expressive language which was consistent throughout the interview and testing session. Though his overall scores on many measures of language skills such as confrontation naming, general word knowledge, verbal reasoning, and receptive language were all intact, his expressive challenges were evident on each of these tasks in his labored process to construct each response. For example, while attempting to

define the word "curious", he demonstrated difficulty with saying the word "inquisitive" and instead said "…which will attempt to '*inquisit*'". He also spoke circumstantially and provided a rambling explanation related to *Alice in Wonderland* which was difficult to follow and did not add substantially to his definition of "curious". Mr. Heal's visuospatial abilities were generally quite well preserved with scores in the average to superior range. Mr. Heal's ability to learn and recall verbal information was strongest for information that contained an inherent structure (i.e. a short story). His ability to learn and recall visual information was generally commensurate with his verbal memory abilities. Mr. Heal's ability to plan, think ahead, and reason were average to superior and represent an area of relative strength. Mr. Heal's self-reported affective functioning suggests the possibility of depressive mood symptoms, though these likely do not rise to the level of clinical significance.

Impressions: Mr. Heal is bright and possesses very well-developed intellectual skills, many of which have been preserved after his stroke. Though certain areas of cognitive functioning appear to have been mildly affected by the stroke (memory and attention) he continues to perform in at least the average range in these areas. Mr. Heal's primary area of cognitive decline after the stroke is related to expressive language. As described above, Mr. Heal's word knowledge and verbal reasoning ability remain superior after his stroke; however, his challenges with speech formation, both in terms of nonfluent speech and an inability to convey thoughts succinctly, make it difficult for him to demonstrate these abilities with fluidity. Though Mr. Heal's ability to think about and understand his work as a lawyer remains grossly intact after his stroke, his ability to effectively and fluently communicate his ideas, rationale, and opinions have significantly declined.

## RECOMMENDATIONS

1. Mr. Heal should engage in speech and language therapy in order to improve his ability to communicate effectively, although it should be acknowledged that substantial improvement is unlikely this long post-injury. Therefore if he does return to legal work, it is recommended that he limit his work so that verbal expression is not central to his role.

2. After discussing his preferences with him, it is recommended that Mr. Heal consider the benefit of resuming work in the field of computer programming as opposed to law. His language difficulties should be less of an issue in this field, and his well-preserved executive skills suggest that the major skills needed to complete this type of work were not affected by his stroke.

3. When possible, Mr. Heal may wish to communicate using written language in the form of notes or emails. By doing so, he may find it easier to express his intended meaning. Additionally, he would be able to read and check his written communication for accuracy, resulting in more effective communication.

4. It is recommended that Mr. Heal have a discussion with his physician about the concerns that have led to discontinuation of his medications. Mr. Heal appears to have the cognitive abilities to make an informed decision, and his concerns about the side effects of these treatments may be reasonable, but he may be unaware of his increased risk of having a second stroke or other cardiac event without appropriate care.

Thank you for allowing us to participate in the care of this patient. Please feel free to contact Michael Gaskell, M.A. or myself if we can be of any further assistance. A total of 8 hours of professional time was spent in patient evaluation, test scoring, interpretation, and report generation. Michael Gaskell, M.A., Neuropsychology Intern, participated in all portions of this assessment.

Score summary for this assessment is detailed in a separate document.

________________________

Brian K. Dessureau, Ph.D.
Neuropsychologist
Clinical Associate Professor
Depts. of Psychiatry and Pediatrics

Electronically signed by:BRIAN DESSUREAU Ph.D. Dec 2 2015 11:31AM EST Author