VERIFICATION

I, Laird J. Heal, state that the above allegations and the exhibits are truthful and accurate to the best of my ability and knowledge, under pains an penalty of perjury.

Laird J. Heal

April 7, 2026

Exhibit List

Exhibit 1. Neuropsychological Assessment, December 2, 2015
Exhibit 2. Email from Peter Martel, March 23, 2026
Exhibit 3. Email from Peter Martel, March 24, 2026
Exhibit 4. MFS Safety Policy approved March 2, 2025
Exhibit 5. Complaint filed March 19, 2026 with the Human Rights Commission
(HRC Exhibit 1) Firebird Invitation to Participate
(HRC Exhibit 2) Text message from Peter Martel, February 23, 2026
(HRC Exhibit 3) Jack in the Green Morris webpage
(HRC Exhibit 4) MFS Safety Policy approved September 7, 2025
(HRC Exhibit 5) Schneckburger Trio Concert announcement
(HRC Exhibit 6) Email message from Peter Martel, February 23, 2026
(HRC Exhibit 7) Email from William Potter, February 25, 2026

Exhibit 1

# Exhibit 1

UMassMemorial

Patient Name: LAIRD HEAL
Encounter Date: Oct 29 2015 1:05PM
BRIAN DESSUREAU Ph.D.

DOB: 05/14/1955
MRN: 520109936

## NEUROPSYCHOLOGICAL ASSESSMENT

REASON FOR REFERRAL: Mr. Laird Heal experienced a left posterior temporal lobe stroke on 01/28/14 and was referred by Richard Goddeau, DO for neuropsychological evaluation in order to evaluate his current cognitive abilities and help determine his fitness to return to work as a lawyer.

BACKGROUND INFORMATION: Mr. Heal is a 60 year-old, right-handed man with a medical history notable for left posterior temporal lobe stroke. On 01/28/14, Mr. Heal was transported by EMS to the UMass Memorial Medical Center emergency department where he displayed pronounced expressive and receptive aphasia. He underwent a CT scan in the emergency department which revealed a questionable small focus of developing infarction in the left posterior temporal lobe and a left middle cerebral artery occlusion/embolus. Over the course of this admission, he was also diagnosed with cardiomyopathy, arrhythmia, hospital acquired pneumonia, fever, a thyroid nodule, and pleural effusion. At the time of discharge, he continued to experience pronounced aphasia.

Mr. Heal participated in occupational and speech therapy during his hospitalization; however, his therapy was not continued after discharge. Mr. Heal stated that because his speech difficulties have persisted and interfered with his work, he very recently resumed speech therapy. Mr. Heal reported that his language difficulties are his primary concern. He described having particular difficulty hearing and understanding numbers and days of the week. He also described expressive difficulties in which he stammers and becomes stuck saying one sound of a word. He offered the example that he was trying to say "Mañana" to a colleague and he could only say "n-n-n-n" repeatedly. He also reported being able to visualize words but being unable to effectively produce them vocally. This was observed during the testing session where he could spell a word aloud, but could not pronounce the word. Mr. Heal reported that his basic reading abilities have not been affected, but he is no longer able to "speed read". He described his organizational skills as being affected by the stroke, while his memory, ability to navigate while driving, and attention are unaffected.

Mr. Heal reported that since his discharge from the hospital in early 2014, he has discontinued taking his prescribed medication against his physician's advice. He described his reason for doing so by saying that while his physician's focus was on preventing another stroke through medication, the side effects of these medications were adversely affecting his greater well-being. Mr. Heal reported that he has always preferred to avoid doctors, even prior to his stroke. Medical records indicate that he experienced a decline in his overall health beginning around August

2013, which included decreased exercise tolerance, shortness of breath, and heart palpitations. During the interview, Mr. Heal reported that he had also been experiencing ongoing cardiac problems, which had required extensive medical workup; however, Mr. Heal reported that these problems have now completely resolved, which he believes to be related to the fact that he has stopped storing his mobile telephone in his left breast pocket. He reported no history of transient ischemic attacks (TIAs), concussions, seizures, or other major health problems.

Mr. Heal reported that his mood has declined in recent years, though he made a point to clarify that he is not depressed. When asked about finding joy in his daily life, he stated "I'm not as much fun as I used to be". He also reported that he used to "love every minute" of computer programming in the past, and he now tends to "hate every minute" of it. He reported having no relationship with his children since his divorce, which has been quite saddening to him. Mr. Heal reported that he does not experience thoughts of suicide. He reported that he has never undergone mental health treatment, with the exception of therapy that he described as being in some way required during his divorce.

Mr. Heal reported that he earned an undergraduate degree in mathematics and worked as a computer programmer from 1976 to 2001. He earned a law degree in the 80s and has practiced civil law where he worked to "keep people in their homes". He reported that he was suspended from practicing law after his stroke. He has continued to remain active doing consulting work but is not currently offering legal opinions. While Mr. Heal initially reported that he was capable of returning to work as a lawyer, he later explained that he felt as though he would instead be best suited for returning to programming.

BEHAVIORAL OBSERVATIONS: Mr. Heal arrived approximately 15 minutes late to the first appointment and was unaccompanied. For his second appointment, he mistakenly arrived at 9:00am when his appointment was scheduled for 1:00pm. He walked without assistance and had a somewhat stiff gait. His fine motor skills were grossly intact. He appeared somewhat unkempt with messy, untrimmed hair. He wore a dress shirt which was very tight around his belly. Mr. Heal maintained appropriate eye contact. He reported that he did not require corrective eyewear or hearing devices. Mr. Heal was alert and oriented to person, place, and time, and could accurately name current political figures. His speech was generally stilted, effortful, low in volume, and slow in pace. He produced a number of phonemic and semantic paraphasias, and he mispronounced known words. Mr. Heal was aware of when he had made an error and was usually able to correct the error if given the time. His tone of speech was generally lacking strong inflection. His speech production was less than expected given his profession and education level; however, he answered questions fully and was able to elaborate on certain topics when prompted. The content of his speech was generally appropriate, and he often filled time between tests with short personal anecdotes. His affect during the interview was somewhat

blunted though euthymic. His facial expressions were minimal, however, he smiled and joked occasionally. Mr. Heal understood the directions for each test and very rarely needed clarification. Mr. Heal displayed strong attentional focus, persisted during testing, and displayed good effort. The following test results are likely an accurate reflection of his current cognitive abilities.

ASSESSMENT RESULTS

General Intellectual Functioning: Based on Mr. Heal's self-reported ability, his educational and professional level, and his performance on several subtests of an intelligence measure, his premorbid general intellectual functioning is likely at least high average. Mr. Heal reported during the interview that since an early age, he performed intellectually at a level that exceeded that of his peers. He stated that he was often bored and not challenged by schoolwork. Additionally, Mr. Heal's education level (Juris Doctorate) and work as both a computer programmer and attorney further support the notion that he possesses well-developed intellectual abilities. Formal intelligence testing revealed above average performance. His verbal skills ranged from above average to superior, with slightly better performance on a task requiring verbal abstract reasoning than a measure of general word knowledge. He performed in the superior range on both a measure of visuospatial construction abilities and a measure of spatial pattern recognition. His performance on tests of working memory, or his ability to attend to, remember, and manipulate verbally presented information, was variable with performances ranging from the moderately impaired to high average range. A test of processing speed was average.

Attentional Functions: Mr. Heal scored in the average range on both a measure of rapid visual motor scanning speed and on a test of visuomotor processing and attention. His ability to repeat a verbally presented series of numbers was moderately impaired overall; however, his performance improved on more challenging sets of items within this test, suggesting he may have modified his strategy on latter portions of the measure after realizing the difficulty of the task. Performance indicators on a test of sustained attention requiring that he visually attend to letters flashed on a computer screen over a long period of time were not significantly elevated and his performance was consistent with a nonclinical profile (Confidence Index = 67%). In general, Mr. Heal's abilities related to attention were somewhat variable with scores ranging from moderately impaired to average. Any impaired scores are very likely representative of a decline from his previous abilities, and it is also quite possible that his average performance on other measures of attention also represent a decline as compared to his very strong premorbid abilities.

Language Functions: During the test session, Mr. Heal demonstrated a number of difficulties related to expressive language. He struggled to produce language fluently and to express

thoughts and ideas in a succinct and clear way. Mr. Heal's insight into his difficulty was variable. He showed a full awareness of his difficulty with word finding and expressing specific words. He seemed less aware of his difficulty with expressing ideas clearly or telling stories in an articulate way. Formal testing of language abilities revealed that, despite his expressive difficulties, his word knowledge and verbal abstract reasoning skills are in the above average and superior ranges respectively,indicating that his verbal knowledge is fully intact. Similarly, while Mr. Heal struggled to form specific sounds in naming visually presented pictures, when given time he was ultimately able to express the correct word and scored in the high average range. His performance on a test of written language that required him to write a brief description of a picture revealed average performance. His ability to read a short passage aloud revealed mildly impaired accuracy and mildly to moderately impaired fluency. A measure of his ability to repeat words and phrases revealed phonemic and semantic paraphasic errors, which he was immediately aware of and able to correct given enough time. On tests of verbal fluency, Mr. Heal performed in the average range on both semantic and phonemic measures. The speed at which he was able to rapidly switch between two semantic categories of words was low average with average accuracy. Mr. Heal's receptive language skills appeared to be grossly intact based on his ability to understand and follow spoken directions during testing, and his ability to complete a task requiring increasingly difficult oral commands.

<u>Visuospatial and Motor Functions</u>: The prorated index of Mr. Heal's visuospatial and motor abilities fell in the superior range, based on his ability to quickly reproduce visual designs with blocks and to identify spatial and conceptual patterns. Similarly, he was able to accurately draw the face of a clock and draw hands set to a specific time. His ability to accurately copy a complex, detailed figure was in the moderately impaired range though this appeared more due to carelessness regarding the details than primary visuospatial impairment. A test of his fine motor abilities, which required him to place small pegs into holes, revealed severely impaired abilities in his dominant right hand and low average performance in his left hand. These right-handed fine motor difficulties may be reflective of his left hemisphere stroke.

<u>Learning/Memory Functions:</u> On a measure of immediate recall for a list of 15 random words, Mr. Heal recalled four words after the first trial which falls in the mildly impaired range. His score improved over the course of four subsequent trials (4, 7, 9, 8, 12) resulting in overall learning that fell into the low average range. He scored in the high average range on a test of immediate recall for an orally presented story. His immediate recall for a number of individually presented visual stimuli was average, while immediate recall for a single complex stimulus was low average. His delayed recall was low average for the random list of words, above average for the story, and average for both individual designs and the single complex figure. In general, he learned and retained verbal information more easily when the information contained inherent structure (such as in the form of a story) as opposed to information without structure (random

words). Overall, Mr. Heal's ability to learn and retain information is slightly lower than expected given his intellectual abilities.

Executive Functions: Mr. Heal demonstrated average to superior abilities on tasks requiring him to plan ahead, think flexibly, and monitor his behavior. On a test of visual planning requiring him to efficiently construct towers while following specific rules, he demonstrated superior speed, accuracy, and self-monitoring ability. He performed in the high average range on a measure which required that he make guesses about the inexplicit rules of the task based on limited feedback. He scored in the average range on tests of phonemic and semantic fluency. He scored in the low average range on a separate test of fluency which required that he quickly alternate between two categories of words. A test of his ability to quickly recite the days of the week and months of the year in various orders (e.g., forwards, backwards, etc.) was mildly impaired due to general slowing in his verbal output and minor errors which were likely related to difficulty with expressive speech (e.g. Mr. Heal fumbled over the letters "U" and "V" while reciting the alphabet). His ability to alternate between numbers to letters in ascending order was average. His ability to draw a clock with hands set to a specified time was average.

Affective Functions: During the interview, Mr. Heal denied experiencing depression; however, he reported that his mood has declined in recent years as a result of his divorce and lack of a close relationship with his children. He reported experiences consistent with anhedonia; where he used to "love every minute" of computer programming, he now "hates every minute". Though he reported changes in mood and mild depressive symptoms, it is not likely that his affective functioning has an appreciable impact on his cognitive abilities.

## SUMMARY/DISCUSSION

Reason for Referral: Mr. Laird Heal is a 60 year-old, Caucasian man who experienced a left posterior temporal lobe stroke on 01/28/14. Richard Goddeau, DO referred Mr. Heal for neuropsychological evaluation in order to assess his current cognitive abilities and help determine his fitness to return to work as a lawyer.

Summary of Test Results: The results of the test battery along with Mr. Heal's self-reported abilities, his educational attainment, and his professional accomplishments suggest that he is of at least high average intellectual functioning. Mr. Heal's attentional abilities ranged from moderately impaired to average. Mr. Heal demonstrated difficulty with expressive language which was consistent throughout the interview and testing session. Though his overall scores on many measures of language skills such as confrontation naming, general word knowledge, verbal reasoning, and receptive language were all intact, his expressive challenges were evident on each of these tasks in his labored process to construct each response. For example, while attempting to

define the word "curious", he demonstrated difficulty with saying the word "inquisitive" and instead said "…which will attempt to '*inquisit*'". He also spoke circumstantially and provided a rambling explanation related to *Alice in Wonderland* which was difficult to follow and did not add substantially to his definition of "curious". Mr. Heal's visuospatial abilities were generally quite well preserved with scores in the average to superior range. Mr. Heal's ability to learn and recall verbal information was strongest for information that contained an inherent structure (i.e. a short story). His ability to learn and recall visual information was generally commensurate with his verbal memory abilities. Mr. Heal's ability to plan, think ahead, and reason were average to superior and represent an area of relative strength. Mr. Heal's self-reported affective functioning suggests the possibility of depressive mood symptoms, though these likely do not rise to the level of clinical significance.

Impressions: Mr. Heal is bright and possesses very well-developed intellectual skills, many of which have been preserved after his stroke. Though certain areas of cognitive functioning appear to have been mildly affected by the stroke (memory and attention) he continues to perform in at least the average range in these areas. Mr. Heal's primary area of cognitive decline after the stroke is related to expressive language. As described above, Mr. Heal's word knowledge and verbal reasoning ability remain superior after his stroke; however, his challenges with speech formation, both in terms of nonfluent speech and an inability to convey thoughts succinctly, make it difficult for him to demonstrate these abilities with fluidity. Though Mr. Heal's ability to think about and understand his work as a lawyer remains grossly intact after his stroke, his ability to effectively and fluently communicate his ideas, rationale, and opinions have significantly declined.

## RECOMMENDATIONS

1. Mr. Heal should engage in speech and language therapy in order to improve his ability to communicate effectively, although it should be acknowledged that substantial improvement is unlikely this long post-injury. Therefore if he does return to legal work, it is recommended that he limit his work so that verbal expression is not central to his role.

2. After discussing his preferences with him, it is recommended that Mr. Heal consider the benefit of resuming work in the field of computer programming as opposed to law. His language difficulties should be less of an issue in this field, and his well-preserved executive skills suggest that the major skills needed to complete this type of work were not affected by his stroke.

3. When possible, Mr. Heal may wish to communicate using written language in the form of notes or emails. By doing so, he may find it easier to express his intended meaning. Additionally, he would be able to read and check his written communication for accuracy, resulting in more effective communication.

4. It is recommended that Mr. Heal have a discussion with his physician about the concerns that have led to discontinuation of his medications. Mr. Heal appears to have the cognitive abilities to make an informed decision, and his concerns about the side effects of these treatments may be reasonable, but he may be unaware of his increased risk of having a second stroke or other cardiac event without appropriate care.

Thank you for allowing us to participate in the care of this patient. Please feel free to contact Michael Gaskell, M.A. or myself if we can be of any further assistance. A total of 8 hours of professional time was spent in patient evaluation, test scoring, interpretation, and report generation. Michael Gaskell, M.A., Neuropsychology Intern, participated in all portions of this assessment.

Score summary for this assessment is detailed in a separate document.

______________________

Brian K. Dessureau, Ph.D.
Neuropsychologist
Clinical Associate Professor
Depts. of Psychiatry and Pediatrics

Electronically signed by:BRIAN DESSUREAU Ph.D. Dec 2 2015 11:31AM EST Author

Exhibit 2

# Exhibit 2

Case 1:26-cv-00263-JL Document 1-5 Filed 04/07/26 Page 12 of 70

Subject: Monadnock Folklore Society Activities
From: Peter Martel <dancingbrook@gmail.com>
Date: 3/23/26, 8:15 PM
To: Bud <lairdheal@yahoo.com>

Laird,

Your showing up tonight was not OK. To make it very clear, until further notice, you are not allowed to come to Monadnock Folklore Society-related activities. I know it is not easy, but that was our decision and it remains that way.

If you show up, you will be told to leave every time. I assume you know we could take more substantial action, but we are trying to avoid that, and I hope you can respect that.

Your showing up without a clear written indication from me or the Board President saying it is OK only makes resolution more difficult.

Thank you for respecting that decision going forward,

Peter

Exhibit 3

# Exhibit 3

Case 1:26-cv-00263-JL Document 1-5 Filed 04/07/26 Page 14 of 70

Subject: Re: Monadnock Folklore Society Activities
From: DBG <dancingbrook@gmail.com>
Date: 3/24/26, 10:48 AM
To: Laird Heal <lairdheal@yahoo.com>

Laird,

From my original note (dated 2/23/26):

> ...the board has voted to place an indefinite moratorium on your participation in all events we sponsor or organize, effective today. This includes our Monday night dances, the Peterborough Dance, our concerts, the Morris dance troop, and any other Monadnock Folklore Society events or activities.
>
> This decision reflects the board's responsibility to maintain an environment where all participants feel safe and welcome, including you. I am not prepared at this time to define conditions or a timeline for revisiting it beyond an initial outreach within two to four weeks.

I have communicated with you several times over the last four weeks, and never indicated the moratorium had been lifted. I had hoped a period of distance would be helpful for everyone, but that benefit has been difficult to realize given the various interactions, including last night.

My objective was to be able to spend the board time sorting out how best to deal with this situation in a way that was constructive and useful for all involved. Instead, much time has been spent dealing with additional issues related to your interactions since Feb. 23.

At our meeting on Sunday, there was no decision to lift the moratorium, but we will be pursuing further strategies for how to deal with similar situations.

Instead of pursuing an appeal at this time, I'd again encourage you to give us all a break from interactions that add to our burden. Using that time to contemplate what you might do differently would also allow us to focus on finding strategies that benefit everyone involved.

I will inform the board that you wish to appeal. From our policy:

> A person who has raised a concern, or the subject of a concern, may submit a request in writing for a review of any action taken to resolve a concern. The request should include any new information provided by any party that is relevant to the initial concern. If any agreements were made to resolve a concern, the person making the appeal should detail how the agreements have been completed.

Case 1:26-cv-00263-JL Document 1-5 Filed 04/07/26 Page 15 of 70

The organizers will attempt to resolve all reported concerns but do not promise specific outcomes.

For your sake, from me as an individual, not as a board member, I strongly encourage you to:
— Stop testing the boundaries of the board's decision.
— Instead of finding exceptions to what has been shared, look instead at what concerns have been expressed, and what you have also shared back that actually adds to our concerns.
— If you wish to appeal, you might first identify and acknowledge the concerns shared that led to this decision, followed by what you will do differently.

Sincerely,

Peter

'...the slimmest of instructions, "To use your gifts and dreams for good." '
— From Braiding Sweetgrass by Robin Wall Kimmerer

> On Mar 24, 2026, at 12:51 AM, Laird Heal <lairdheal@yahoo.com> wrote:
>
> In your "DBG" email (no subject, 3/12/2026, 8:10 PM) you said that the MFS Board would meet on 3/22. Owen Hale described that item was to decide on further sanctions.
>
> I had every right to expect that no further sanctions were imposed because I heard nothing. In your "Peter Martel" email ("Re: Moratorium", 3/13/2026, 5:44 AM) you said that you did not want to "continue with the conversation". Thus, there was only one way to find confirmation, i.e., in person.
>
> Your dialogue last night was disjointed at times. You accused me of not waiting for four weeks, while the 3/13 email message recognized that I was cooperating with four weeks: starting on February 23, 2026, ending on March 22, 2026.
>
> It looks like that on Monday you ejected me from the Nelson Town Hall on your own, or possibly with the "Board President".
>
> The "Safety Policy" guarantees an "Appeal Process" but nothing of the like has been accorded me. Please advise all concerned that I should be allowed to appeal.

Peter Martel wrote:

> Laird,
>
> Your showing up tonight was not OK. To make it very clear, until further notice, you are not allowed to come to Monadnock Folklore Society-related activities. I know it is not easy, but that was our decision and it remains that way.
>
> If you show up, you will be told to leave every time. I assume you know we could take more substantial action, but we are trying to avoid that, and I hope you can respect that.
>
> Your showing up without a clear written indication from me or the Board President saying it is OK only makes resolution more difficult.
>
> Thank you for respecting that decision going forward,
>
> Peter

Exhibit 4

# Exhibit 4

# Safety Policy at MFS Contra Dances

**Safety Policy**

Monadnock Folklore Society approved 03/02/25

**Introduction**

The Monadnock Folklore Society is dedicated to sponsoring events that are safe and enjoyable experiences for all attendees.

We encourage you to assist us by modeling actions that make you and those around you feel comfortable and safe, asking others about their needs and preferences, and being open and communicative about your own needs and preferences.

MFS is committed to doing the best we can. We are open to feedback on how we can continue to improve.This is a living document and will be updated as needed.

Contact a dance organizer, or send email to contrainfo@monadnockfolk.org to report a violation of this safety policy.

**Statement of Community Care**

Inclusion: We are welcoming to all, of any sex, gender identity and expression, age, sexual orientation, disability, physical appearance, body size, race, ethnicity, or religion. We actively work to create inclusive spaces.

Consent: Anyone can say yes or no when asked to dance, with no reason needed for declining. It's fine to say no to a dance with one person and yes to someone else. Ask for consent before initiating a flourish such as a twirl or spin. We encourage clear communication between dancers about what feels safe and comfortable.

Accommodation: We encourage dancers to inform and ask each other about any personal limitations and to accommodate each other as needed, graciously.

Safety: We dance with the safety and comfort of other dancers in mind. There is a fine line between being playful and interfering with others. Each dancer has both the right and the responsibility to maintain control of their body. We do not lift another dancer off the floor. We do not dip people without their explicit permission. Note that it is possible to harm someone accidentally and it's up to each dancer to be aware of how others are reacting to their touch. Someone pulling away or saying "Ow" are as important to notice as being told specifically that you caused harm.

Respect: We respect each other. We believe that each attendee has something valuable to offer. We trust that all attendees will show mutual respect.

Roles: Anyone can dance with anyone. Some folks dance one role for a whole evening; others switch back and forth. We trust that the dancer coming toward us in the contra line is dancing the role they chose.

**Unacceptable Behaviors**

- Harassment: offensive behavior related to, but not limited to, discrimination on the basis of sex, gender identity and expression, age, sexual orientation, disability, physical appearance, body size, race, ethnicity, or religion.
- Unwanted or sexualized touching
- Insisting on partnering or continued asking after the other person has said “no”
- Insisting on flourishes after the other person has indicated they do not want to
- Lifting the other person such that their feet leave the floor
- Dancing while inebriated. Monadnock Folklore Society dances are smoke, drug, and alcohol-free.
- Stalking
- Hitting or other on-purpose physical harm
- Weapons are not permitted at our events. “Weapon” is defined as any firearm or other object that has been designed to inflict bodily harm or physical damage to property. Dance organizers have discretion to interpret this definition, and to ask an attendee to leave or remove the weapon from the property.
- Criminal activity, theft, vandalism

**Action Plan**

The MFS Board has the right to permanently ban someone from Monadnock Folklore Society events if the Board believes they pose a threat or harm to the community.

Levels of Harm

Level 1: Person has made someone uncomfortable

The person has broken a policy that does not cause significant harm to someone else.

One or ideally two of the organizers will have a conversation letting the person know that they have witnessed, or it’s been reported, that the person has made someone uncomfortable.

It’s expected that the person will be open to this conversation with the organizers.

Repeated offenses at this level, or ignoring feedback, will lead to the next level.

Level 2 – Person has caused harm to another person

The person has broken the safety policy and it caused harm in some way.

After getting feedback on their behavior, the person’s response determines the action taken. It’s expected that they will be open to a conversation with the organizers about their behavior.

If the person acknowledges the harm done and shows a willingness to both have a discussion and to change the behavior, they could be allowed to stay (under observation) at the organizers’ discretion.

If the person responds with anger, doesn’t take responsibility, or doesn’t show willingness to change, they will be asked to leave.

Depending on the person’s specific behavior, action may reach Level 3.

Level 3 – Person poses continued threat to community safety

The person may be banned from future events at the organizers' discretion.

**Appeal Process**

A person who has raised a concern,, or the subject of a concern, may submit a request in writing for a review of any action taken to resolve a concern. The request should include any new information provided by any party that is relevant to the initial concern. If any agreements were made to resolve a concern, the person making the appeal should detail how the agreements have been completed.

The organizers will attempt to resolve all reported concerns but do not promise specific outcomes.

**Additional Policies**

Photography

Photographers may be present at dances. Consent to be photographed or recorded is assumed. However, any attendee has the right to tell a photographer or dance organizer that they do not wish to be photographed, and their request must be honored.

Exhibit 5

# Exhibit 5

STATE OF NEW HAMPSHIRE
COMMISSION OF HUMAN RIGHTS

CONCORD, SS} DOCKET NO. ___________

| | |
|---|---|
| Laird J. Heal<br><br>v.<br><br>Lisa Sieverts, Bruce Myrick, Christopher Salmon, Larry Ames, Peter Martel, Owen Hale and Matt Garland, Perin Ellsworth-Osanya, Tom Buttrick and Valerie van Meier, each individually and Board of Directors of the Monadnock Folklore Society, Bill Potter, individually and as Master and Foreman of Jack in the Green, and Kim Wallach as Master of Firebird Morris. | COMPLAINT |

1. NOW COMES Laird J. Heal and files this Complaint against Lisa Sieverts, Bruce Myrick, Christopher Salmon, Larry Ames, Peter Martel, Owen Hale and Matt Garland, Perin Ellsworth-Osanya, Tom Buttrick and Valerie van Meier, each individually and Board of Directors ("Board") of the Monadnock Folklore Society ("MFS"), Bill Potter, individually and as Master and Foreman of Jack in the Green, and Kim Wallach as Master of Firebird Morris.

## Introduction

2. Plaintiff has been participating in MFS activities for more than 25 years, principally at the contra dances, both in Nelson, New Hampshire and Peterborough, New Hampshire, but also at the performances. Plaintiff also participates with the Jack in the Green and Firebird Morris teams. Over 10 years ago, Plaintiff suffered a stroke and has a continued language disability. As of February 23, 2026, MFS barred Plaintiff from participating from any activities or

attending any performances for an indefinite period. MFS has not provided any reasonable accomodation for my disability, although has done that in the past for others.

3. MFS has also given preferential treatment to another participant who claim a sexual orientation more to the preference of members of the Board. In particular, when I complained about violent actions in a dance, the perpetrator was told that I was the complainer, in the sense that we put together in a room with two Board members and talked. When I disclosed that my sexual orientation, which I have throughout my participation at MFS activities, was what what I understood as nonbinary, I was told that celibacy was not what being nonbinary was, 'trans' did not mean transitioning to a different sex as it was meant in the 1960's, and my lack of understanding of what 'trans' means was unacceptable.

4. MFS has leveled complaints on me which were each left anonymous. Each were said to be resolved, but now I am told that other dancers are uncomfortable with my very presence, let alone dancing among them.

5. In the past, dancers with brain injuries have continued to dance at MFS activities and as many as two of the Board members have assisted. I have not been offered any such accomodation or any other reasonable accomodation.

6. It appears that the Board have made a decision based on a perceived or assumed sexual orientation which either is incorrect, is not to the Board's liking or is not a misguided decision as no reasonable person would object to my presence or my participation.

<u>Parties</u>

7. Plaintiff Laird J. Heal has an address of 8 Linden Street, Winchendon, MA 01475.

8. Defendant Lisa Sieverts, with an address at 175 Brickyard Road, Nelson, NH 03457, is a member of the MFS Board.

9. Defendant Bruce Myrick, 54 Brook Street, Keene, NH 03431, described Monadnock Folklore Society's President and a member of the MFS Board.

10. Defendant Christopher Salmon, with an address of 375 Keene Road, Antrim, NH 03440, is a member of the MFS Board

11. Defendant Larry Ames, with an address at 227 Greenfield Road, Francetown, NH 03043, is a member of the MFS Board.

12. Defendant Peter Martel, with an address at 68 S. Bennington Road, Bennington, NH 03442, is a member of the MFS Board.

13. Defendant Owen Hale, with an address at 75 Murdough Hill Road, Nelson, NH 03457, is a member of the MFS Board.

14. Defendant Matt Garland, with an address of 220 N. Shore Road, Munsonville, NH 03457 has been named as a current member of the MFS Board at the regular Monday night dances.

15. Defendant Perin Ellsworth-Osanya, with an address at 46 Pinehurst Avenue, Keene, NH 03431, is described as member of the MFS Board on the website page at https://www.monadnockfolk.org/about/board-of-directors/.

16. Defendant Tom Buttrick, with an address of 9 Log Cabin Road, Nelson, NH 03457, is, according to the webpage a member of the MFS Board.

17. Defendant Valerie van Meier, with an address of 9 Log Cabin Road, Nelson, NH 03457, according to webpage is a member of the MFS Board.

18. Defendant Board of Directors ("Board") is constituted of the above Defendants, upon information and belief, doing business as Monadnock Folklore Society.

19. Defendant Bill Potter, with an address at 634 Deer Meadow Road, Webster, NH 03303, individually and as Master and Foreman of Jack in the Green Morris.

20. Defendant Kim Wallach, with an address of 43 Hurricane Rd, Keene, NH 03431, as Master of Firebird Morris.

Allegations in common to all counts

21. On or about February 22, 2026, Defendant Peter Martel made a request that I "friend" him on Facebook. Because he was a member of the Board, I complied. I received a text message at a number which I normally use only as a real estate agent, which I thought was odd, and an email message at an address which MFS would know. Each message asked for a telephone conversation at noon. At noon, Martel informed me that I was barred from any MFS activities for an indefinite period.

22. I had a stroke in January 2014 and have been determined to be permanently disabled. The lingering effects of the stroke include percipient and espressive aphasia. I may lose a word for an extended period; I may mispronounce a word; if tense, I may not be able to speak intelligible at all. If I cannot pronounce a word, I cannot understand it if spoken by someone else; if the speaker talks too fast or merely tries to spell a word, I cannot process the information and the

morphemes are lost entirely; and understanding proper nouns or numbers is especially difficult.

23. Presently and in the past, MFS has encountered dancers with disabilities and have gone to the point where two of the board member (as it then constituted) would try to assist. That dancer was in an accident at 18 but in her 40's regressed. She still regularly danced with me as the only partner until, as I said, even a partner and an assistant became to be too much. There is another dancer who requires reasonable accomodation, both by failing to follow a set of dance moves which are too fast and by being prone to falling down if moving too fast but as far as I know, MFS has not banned this dancer. I believe I am still improving from the 2014 stroke. I can follow directions, although the disabled dancer mentioned in the prior sentence can understand language better than I and has corrected me during the instruction and walk-through period. I have been "contra" dancing for over 49 years and have never injured anyone.

24. MFS is the business of conducting public performances and participation. Each of its venues are provided by government auspices or are in public spaces. Even the two Morris dance organizations stress they are open to the public in their current proclamations. See Exhibits 3, 4 and 5. I am being discriminated by MFS as it prohibits me from these public houses and spaces.

25. MFS states that "community members [...] expressed feeling uncomfortable at our events", but that is nothing but a pretext. This does not come to the level of an actual reason to exclude me from their activities. There is nothing, either in fact or which a reasonable person would conclude that MFS has the right to

exclude me from their community, particularly because I am a disabled person and a member of a protected part of the population.

26. MFS has not offered me any reasonable accomodation to my disability. Excluding me is prima face evidence of its violation of the American With Disability Act and its willingness to flaunt the law, even when MFS states it is open and welcoming to everyone.

27. MFS is well aware of my disability, which is due to a stroke which I am recovering from.

28. MFS and Bill Potter are well aware of my sexuality, which should not alarm anyone.

29. On Monday, February 16, 2026 Firebird Morris performed at the MFS Monday contra dance and announced that they were actively recruiting more dancers and musicians.

30. On or about the same day, Firebird Morris posted on Facebook that it was seeking new dancers and musicians and would meet in Harrisville, New Hampshire.

31. I made a search among the Firebird Morris postings for "Harrisville" and the only posting meeting that criterion said it would meet on Thursdays at 6:30 PM at the Wells Memorial School, so I posted not the link, but the search itself, on Facebook. I preceded that by saying that this was my guess.

32. Lisa Sieverts responded that that that was an old link.

33. Firebird Morris then posted that the dance practices were, indeed, on Thursday at 6:00 PM at the Wells Memorial School in Harrisville.

34. I then deleted the search link, which had the effect of deleting Ms. Sieverts reply.

35. On Wednesday, February 18, 2026 I asked the two men performing for Firebird if it would be helpful for me to attend on the next night, and the answer was that it would allow them to practice with a full team, which is normally with six dancers.

36. Accordingly, I attended the Firebird Morris practice on Thursday, February 19, 2026. As it happened, the four more established dancers practiced and I and the other dancer sang along with the musicians, alternatively.

37. On Monday, February 22, 2026 I was barred from every activity, whether dance or performance and including two associated Morris dance teams, for an indefinite term, with no explanation than unspecified people have expressed discomfort with my presence and without offering any reaonable accomodation to my disabilities.

38. I joined the Jack in the Green Morris team in December, 2025, at the invitation of one of the dancers, Jim McCann.

39. By Wednesday, February 18, 2026 I was a regular participant at the Wednesday Jack in the Green Morris practices.

40. After the Jack in the Morris practices, they have a 'pub', where all sit in a group, some drink alcohol, some eat assorted snacks, and all talk and sing a capella. If the practice is at the Wells Memorial School, the 'pub' have occurred at a home in Nelson, New Hampshire. If the practice has done at "Lakefalls", which is a public accomodation, the 'pub' occurs at the same place.

41. There can be Jack in the Morris practices at other places. Once a month the group meet at the Port Tavern in Newburyport, Massachusetts for 'Porterman', which is a public gathering for everyone to join and sing a capella.

42. Both Jack in the Morris and Firebird Morris perform according to a schedule arranged well ahead.

43. After the December 2024 Solstice Sisters performance, I began to notice that one Nat Backes became to be hostile to me in particular. Each week, it became more physical and more unpleasant. Eventually, Nat, who is several inches taller than I and decades younger, flung me about the dance floor and I was left spinning uncontrollably. I remember how my dance partner, who had told me it was her first contra dance ever, had an expression of concern on her face as I finally was able to stop.

44. For the next three months, I had pain in the shoulder that I had been wrenched but I resolved I had to talk to Nat about his antisocial behavior, so on the next week, while we were passing in the dance line, I told him, "Dancing is not a fight. What you are doing is dangerous".

45. In the past, simply telling a dancer that such actions while dancing was dangerous. However, this time, when we came back together on the dance line, Nat stopped me with his left hand and threw a punch with the right, which was caught by my left. He said, "Look at your hand", then "You caught my hand", then "You grabbed me very hard," and finally, "And it hurt!" There was a pronounced pause between each phrase and it was clear he was fabricating the story as he talked.

46. As it happened, a video of this altercation was published on Facebook and accordingly I reported the matter to Lisa Sieverts, as a member of the Board. She asked if it was recorded on video and if it was done intentionally.

47. Ms. Sieverts decided to have me meet with Nat and on Monday, February 17, 2025, we and Owen Hale, another member of the Board, talked.

48. Ms. Sieverts told me I had to call Nat "Natalie" and not to say "he", but instead "she". I replied that because of my disability I could not reliably say that.

49. Ms. Sieverts told me that Nat was "trans", but when I asked if that meant that Nat was transitioning to a different gender, which I am familiar with, but she said, no, it means that Nat was a female. However, Nat does not present as a female, Nat does not act like a female, Nat uses force and bullied me for no ascertainable reason, which women never do, and Nat continues to go on dates with females. Besides, Nat has not asked me to call him anything except 'Nat'. A couple of years before, Nat had corrected me when I had commented to someone else that I thought he said was his name was "Mac".

50. In the interim, I went to the courthouse in Keene and found no indication that Nathan Backes or similar had ever changed his name to Natalie.

51. After the meeting, Ms. Sieverts accused me of being "prejudiced" against "trans".

52. I cannot fathom how I could be prejudiced against that. I have had experience with many people grappling with individual issues involving sexuality and I have helped each of them work through them. I simply told Ms. Sieverts that she had no idea.

53. The next week, I was confronted by Ms. Sieverts and Chris Salmon, another member of the Board before I was allowed to enter the Monday dance. I was told that I would be watched closely and that I would only be allowed to do exactly what the callers called and without anything extra. In particular, I was told to talk to the other dancers before any “flourish” and get agreement. When I tried to explain that my disability with speaking and hearing would make that impossible, Mr. Salmon shouted at me, getting the attention of other dancers entering the hall and at least one of them asked later about the agitated conversation.

54. When I asked Mr. Salmon not to shout, he said he was not shouting and continued in a loud voice to give me orders, faster than I could reasonably understand. I was at a loss to understand what had occasioned this, other than to complain about another dancer who had used force and injuried me. I had done nothing either to Mr. Salmon or otherwise to occasioned such an outburst and any assault against me.

55. In the following months after that, I continued to inform Ms. Sieverts of the recovery and regained use of the left shoulder, which took at least to mid-June. She replied that I should report any altercation or difficulty I had with “other men”. I took that to understand that I should not report anything about anyone she regarded as a ‘trans woman’. If so, this displays her blatant prejudice.

56. Ms. Sieverts continued to inform me about the Monadnock Folklore Society Code of Conduct and told me if I did not like it that I should leave.

57. At some point during a walkthrough, when I made a step which I thought the caller called for, Mr. Salmon spoke sharply to me and I stopped, but with a paroxymal face he advanced toward me and attempted to push me backward. Just a few minutes later, two dancers in the foursome closer to the stage collided together with some force; Mr. Salmon's saw that, I told him about it at the same time and just smiled and made to attempt to censure or even speak to those dancers even though they certainly were not following the caller's instructions.

58. Mr. Salmon made no indication that he would give any reasonable accomodations to my persistent disability. Alternatively, Mr. Salmon singled me out for the sexuality which he assume from my garb, appearance and manner, which should not have cause any attention whatsoever, except from my inability to speak the right words that the Board is now requiring from anyone in attendance.

59. On or about Monday, October 6, 2025, Ms. Sieverts and Mr. Salmon again confronted me before the regular dance with a two-page list of problems, including that I had spoken about the Code of Conduct as Mr. Salmon was informing those in attendance. I reviewed the Code as then written and, indeed, he was not accurately describing them. In particular, there was no requirement that the dancers speak to each other, only that they communicate. There is also a paragraph requiring dancers to inform each other of disability. I was well within my rights even as listed on that Code of Conduct.

60. I was so upset by being confronted before the dance and accused of breaking the Board's rules that I had a nosebleed and had to leave. In mitigation, I was getting nosebleeds, first on August 16, 2025 (at a non-MFS dance) intermittently,

probably due to falling while mounting climbing, ending in December, 2025. My upset as the dance began was recorded on a video published on Facebook. Yet, the video shows that when two dancers next to me started to go the wrong way, I was able to get their attention and with a wave, avoid a collision and start them going in the right way.

61. When I got home, I was not able to sleep and responded to the Board after 3:00 A.M. The Board responded on October 13, 2025 accepting that none of the problems listed were seriously enough to warrant any further action.

62. The Board's response did said "You may not correct another person's dancing with touch." While this is nonsensical, because contra dancing moves almost always involve touching others and every dancer is constantly giving feedback with each touch. Nevertheless, I normally give leads without touching as a matter of course, as in the example described in Paragraph 60 above.

63. The incident the Board was referring to occurred when a dancer was very confused and turning the wrong way, right into the way of two others. I was following in the walkthrough and simply reached out and turned this dancer into the right way and away from harm. The last time a dancer fell in front of me I was the only person able to be a first responder and by them I had renewed my lifeguard certificate, but I wanted to avoid any possible injury. This kind of correction among dancers is commonplace and there are countless examples, so any criticism of this action is a blatant pretext for excluding me from the community.

64. On December 22, 2025 (at 8:34 AM), I received a email message from Ms. Sieverts entitled "Concern reported to the Monadnock Folklore Society" with the contents, "Laird, The Monadnock Folklore Society received a report that you talked about doing Internet research on several young dancers. Please explain your purpose for doing this research. Lisa Sieverts Monadnock Folklore Society"

65. I responded to Ms. Sieverts at length, again having to guess what the incident was about. I had told Grace Johnson's parents that I found their address online but not their daughter. This was in connection with a conversation when I thought they lived upstate, but I was told that they lived on Long Island. The conversation also mentioned Margaret Iselin, another of the performers that night. The topic of internet searching hardly held the conversation and if there was any concern then, I could have told the Johnsons that each of these dancers had already told me where they were living. Ms. Johnson is almost 40; Ms. Iselin almost 50; neither fit the description of being a young dancer. That night, they were performers.

66. Nevertheless, Ms. Sieverts latched onto this supposed report as a reason to bar me from the Monadnock Folklore Society activities. In her followup, she wrote, "It was the parents who mentioned the internet research of their daughter." This is again markedly different from the accusation in the email message of that morning, as replicated above in Paragraph 64.

67. When I spoke to Ms. Sieverts that evening, she said it was Grace's father that made the report, and not her parents. Mr. Johnson was not a part of the conversation. I explained that Grace had told me she was going to act in a play,

and I asked her to give the dates when the performance was getting close. Instead, I had not seen her for weeks or months, so I had to go look things up on the Internet. Then, when I did find an announcement and printed it out, Owen Hale refused to add this to his other announcements (Ms. Sieverts said that Owen would do the same to him from time to time) and then, when I did come to watch Grace, Owen and his girlfriend were sitting in the same row.

68. Nothing of this comes to the level of a reason to refusing to allow me to even come into the hall where MFS is holding an public activity. Ms. Sievert asked me if I thought it was reasonable to have any concern, but I did not answer at the time because I did not want to start an argument.

69. On February 3, 2026 Owen Hale sent an email message to the Jack in the Green in which he alludes to expressing "discomfort" with my joining Jack in the Green. I was not included in any of the other discussion. Mr. Hale included Matt Garland "because he has perspective on what's been going on at the Monday Dance. However, I was not aware of anything relevant at the Monday Dance since the December 22, 2025 soliliquoy, which appeared to be a complete misunderstanding.

70. I responded to Mr. Hale expressing, among other things, my regret that he was not talking to me if he had the slightest discomfort.

71. I also finally responded to Ms. Sieverts to her question that even internet research of "several young dancers" should not have given her the least qualm, couched these in legal terms, explaining that without contacting those dancers, there was not the least possiblity of any harm. I reiterated that I simply had not done

anything, although I did use the internet to find where Grace Johnson was in a play, and along the way her parents' address popped up.

72. Neither Mr. Hale nor Ms. Sieverts expressed any further reason I should not participate in MFS activities; neither did either offer any reasonable accomodation for any perceived difficulty with my participation.

73. On Monday, February 16, 2026 I watched the Firebird Morris performance during the normal break, starting on or about 8:15 PM. I lined up with another man who started a conversation by saying that I was the only person who he could vent himself at the 40 minutes wasted instead of dancing. I responded by saying that my priority was to grow the community and how the prior week, I asked Valerie Van Meier about Morris dancing as I introduced her to another woman, who had just come back to the Nelson dance and I thought would enjoy joining the Firebird or other women's team in her area. She came back with her husband and son that night, clearly showing how this could grow the community. I continued by agreeing that endless sermonizing in the break could not possibly increase the community; I stopped talking when the next dance, or the talk-through, began, although I was ready to address this other man's issues and further calm him down. Instead, we had a spirited dance.

74. Nothing I did or said on Monday, February 16, 2026 should have been used as a pretext for banning from MFS activities, yet on or about Sunday, February 22, 2026 the Board decided to institute an undefinitely ban. According to Owen Hale, within two to four weeks, ending at March 22, 2026 the Board will vote, not necessarily to lift the ban but more likely to impose further sanctions.

COUNT I - Firebird Morris

75. On Thursday, February 19, 2026 I attended the Firebird Morris practice.

76. On Wednesday, February 18, 2026 I had first consulted with the two men performing with this team and they thought it would be beneficial to have a sixth dancer so to have a full team.

77. My participation was to sing with the musicians. I was invited to select a dance to practice with for the next week.

78. At the end of the practice I was talking to one of the men, Al Stoops, and spoke "she" when I referred to "Alessandra" who was helping a high school student with her Mathematics homework. I was curtly informed that I was to refer to Alessandra as "they". I had to respond by saying that this word-play was probably beyond me. I had already explained to Alessandra that I had had a stroke and after two or three tries at understanding her name, I was told that "Alex" would be okay too.

79. In fact I now often say "she" even when I mean "he" or other pronouns. Normally, I can hear that I have mispronounced a word and I will try to say it again, but it not unusual for me to have to repeat that attempt many times. It is simply not fair to confuse English with new rules and expect me to follow them every time. It is a reasonable accomodation for me to speak as well as I can. However, I am being unfairly discriminated against me due to my disability.

80. On Monday, February 22, 2026 I was informed that I was not to practice with Firebird Morris for an indefinite period, at least two to four weeks. At the time of writing this, the fourth practice will be on Thursday, March 17, 2026.

81. I do not need any special accomodation, but I have not been offered any reasonable accommodation for my disability. I can remember choreographed dances and during the practice, I read lyrics when singing better than I expected, so I continue to recover.

82. Banning from this Firebird Morris team which is ostensibly open to the public is per se discriminative.

83. WHEREAS, the MFS Board and its members should be ordered not to discriminate against me in this manner, and I demand my statutory damages, joint and several, current standing at $96,000.

84. WHEREAS, Kim Wallach and/or Firebird Morris should be ordered not to discriminate against me in this manner.

COUNT II - Jack in the Green Morris practices.

85. On Monday, February 22, 2026 I was informed by the MFS Board that I was not to participate any Jack in the Green Morris practices or even to present at any Jack in the Green Morris performances.

86. Jack in the Green Morris practices in public accomodations and publishes its invitation to any member of the public.

87. Jack in the Green Morris performances involving dancing and singing. After the dances are practiced, during a 'pub' the singing is also rehearsed. Often the 'pub' is done at the same location as the dance.

88. Before the MFS action, I was welcomed by Jack in the Green Morris, practiced the dancing and rehearsed the songs.

89. I have been prevented to participate with or even present at Jack in the Green Morris since Wednesday, February 25, 2026. Upon information and belief, the Wednesday, March 18, 2026 was done in Newburyport, Massachusetts.

90. Banning from Jack in the Green Morris practices and performances which is ostensibly open to the public is per se discriminative.

91. WHEREAS, the MFS Board and its members should be ordered not to discriminate against me in this manner, and I demand my statutory damages, joint and several, current standing at $96,000.

92. WHEREAS, Bill Potter and/or Jack in the Green Morris should be ordered not to discriminate against me in this manner.

COUNT III - Jack in the Green Morris after-practice 'pub'.

93. On Wednesday, February 24, 2026 I went to Kirk Dale's house in Nelson, New Hampshire for the 'pub'.

94. I had sent email the the more established email addresses, info@monadnockfolk.org and lisa@lisasieverts.com to attempt to get confirmation of the ban on MFS activities. In the past, I received answers from those addresses, but now, there was no responses.

95. As soon as I arrived at the pub, I was given corroboration from Owen Hale and Matt Garland. A spirited conversation ensued, mostly about why I should be banned, and just as mostly based on guesswork.

96. I disclosed my sexuality, which should not give the least alarm to anyone in the world, especially in a mixed company, primarily constituted by married and divorced men.

97. When I described the most obvious, yet unstated, trait among some others as being a lesbian “butch” behavior, Alan Peel, Ph.d, referred to that as a slur. Apparently he thought I was pronouncing a different word. The term is in common usage; see https://en.wikipedia.org/wiki/Butch_(slang).

98. I described having long-term friendships with several women with no romantic relationships whatsoever, where I was in the position of guiding these women to where their social difficulties were not so obvious, and to state it more directly, they could fit in.

99. I did not mention that I could include one man, most of the people in the room knew, where I was in the position of supporting him emotionally for most of his life, even after I had a stroke.

100. The pub’s topic drifted into singing and talking about different topics, and ended without ado.

101. Afterwards, I received an email message from Bill Potter, the ‘foreman’ and Master of the Jack in the Green Morris team directing me not to participate at any Jack in the Green Morris activites, including the after-practice pubs. He said that the discussion must have been difficult.

102. Mr. Potter did not offer any reasonable accomodation for my disability. Indeed, as the pub ended, he said that I spoke very well, despite the obvious difficulty others had understanding me.

103. Mr. Potter only offered as a reason for banning me from meeting with my friends as the direction of the MFS Board, despite the statements of the Board that its

decision was not intended to prevent me from talking to others in the dancing community under its auspice.

104.Mr. Potter's decision was discriminative and stating that he was deferring to the Board is nothing but a pretext.

105.WHEREAS, Mr. Potter should be made to pay damages as allowed by RSA 354-A:21(d) for each act in discrimination.

COUNT IV - Lissa Schneckburger Trio

106.There was a concert by the Lissa Schneckburger Trio on Friday, February 27, 2026. See Exhibit 5.

107.I have known Lissa Schneckburger since she was a teenager in Maine (in the late 1990's).

108.Just as the Lui Collins concert held in the Nelson Town Hall, I certainly would have attended the Lissa Schneckburger Trio concert, but I was prevented by the Board.

109.No reason was provided for the Board denying me to enter the venue other than the concern that other people in attendance would be uncomfortable.

110.Except for my assumed sexuality and my obvious disability in communication, there is no reason for preventing me from enjoying myself at a public facility and performance.

111.WHEREAS, MFS should be made to pay damages as allowed by RSA 354-A:21(d).

COUNT V - Monday dances in the Nelson, New Hampshire Town Hall.

112.There were regular dances on February 23, March 2 and March 16, 2026 and I was prevented from attending.

113.No reasonable accomodation to my disability was offered.

114.Except for my sexuality, I would have been allowed to attend.

115.I was banned from MFS after every complaint mentioned to me was resolved without sanction.

116.Every excuse for preventing me from attending is or will be proved to be prextual.

117.WHEREAS, MFS should be made to pay damages as allowed by RSA 354-A:21(d), at least $24,000 per event or in such higher amount to be proved at trial.

COUNT VI - MFS Dance Saturday, March 7, 2026 in Peterborough, New Hampshire

118.There were a dance on March 7, 2026 2026 in Peterborough and I was prevented from attending.

119.No reasonable accomodation to my disability was offered.

120.Except for my sexuality, I would have been allowed to attend.

121.I was banned from MFS after every complaint mentioned to me was resolved without such a extrene sanction.

122.Every excuse for preventing me from attending is or will be proved to be prextual.

123.WHEREAS, MFS and the Board, joint and several, should be made to pay damages as allowed by RSA 354-A:21(d), at least $24,000 per event or in such higher amount to be proved at trial, and the Court should order MFS and the Board to not discriminate against me without offering reasonable accomodation.

## COUNT VII - Retaliation

124.During the February 17, 2025 hearing, I was asked to refer to Nat Backes using 'she' and 'her' for pronouns. I was told that Nat was "trans". However, I could not understand what this word meant as described. I deferred to my continuing disability and language difficulties, but related a story from the Readers' Digest in the 1960's about a woman, after having surgery reassignment from being born as a man, was nevertheless found out because this person because she was still acting as a man, but I was still told me that 'trans' means something else. It seemed that 'trans' would apply to me as well as anyone else but I was told that that was not correct either. To me, Nat was showing classical attributes of the masculine bullying symptoms and indeed, by the end of the hearing, Nat admitted that he 'snapped' and lost his temper, when after all, all I had done was to tell him that dancing was not a fight and what he was doing was dangerous. I cannot call someone a 'trans woman' who displays such unstable and exclusively masculine behavior. Those are the hallmarks of men.

125.After the hearing, Ms. Sieverts accused me of being "prejudiced against trans".

126.Perhaps I will recover from my stroke and ensuring aphasia to the point where I understand 'trans' as Ms. Sieverts, but it seems that the definition changes at Ms. Sieverts' whim.

127.On the next Monday, Ms. Sieverts and Mr. Salmon confronted me and Mr. Salmon in particular was shouting at me before they allowed me to enter the

dance hall, attracting the attention of other dancers, and without making much sense.

128.I was told I had to talk during the dance and listen to the dancers' responses about this ill-defined 'flourish'. However, my disability prevents me from comprehending such discussion, in particular while focusing on the dances, and Mr. Salmon would get even angry and louder without trying to understand.

129.Mr. Salmon told me that every motion and everything else I did would be watched very closely. No reasonable accomodation to my disability was offered.

130.There are deaf dancers who have not been threatened with sanctions or criticized in any way.

131.Ms. Sieverts and Mr. Salmon instituted a siege against me in retaliation for complaining about Nat Backes, who after all was caught in video using undue violence against me.

132.The prejudicial attitude against me and the retaliation flared up on October 6, 2025 and afterwards.

133.Each complaint was, as far as the further responses from Ms. Sieverts, resolved amicably, but none of the complainants were disclosed, so I had to guess.

134.I have had objectively injuries due to MFS' actions, most clearly showed on the video taken immediately being confronted by Ms. Sieverts and Mr. Salmon, and having to leave the dance shortly after that when I had a nosebleed.

135.WHEREAS, MFS should be made to pay damages as allowed by RSA 354-A:21(d), at least $24,000 per occurance or in such higher amount to be proved at

trial, and the Court should order MFS and the Board to not retaliate against me in this manner.

CONCLUSION

136.This Court should give judgment as following:

137.On COUNT I - Firebird Morris, against the MFS Board and its members, joint and several, at least $24,000 per occurrence, currently standing at $96,000, or so much more as proved at trial, and an order that the MFS Board and Firebird Morris and Kim Wallach as Master of Firebird Morris not discriminate against me.

138.On COUNT II - Jack in the Green Morris practices., damages against the MFS Board and the members of the MFS Board, jointly and severally, at least $24,000 per occurrence, currently standing at $72,000, or so much more as proved at trial, and an order that the MFS Board and Jack in the Green Morris and Bill Potter as Master of Jack in the Green Morris not to discriminate against me.

139.On COUNT III - Jack in the Green Morris after-practice ‘pub’., damages against Bill Potter, individually and as Master of Jack in the Green Morris, at least $24,000 per occurrence or so much more as proved at trial, and an order that Bill Potter and Jack in the Green Morris not discriminate against me;

140.On COUNT IV - Lissa Schneckburger Trio, damages against the MFS Board and the members of the MFS Board, jointly and severally, at least $24,000 or so much more as proved at trial, and an order that the MFS Board not discriminate against me;

141. On COUNT V - Monday dances in the Nelson, New Hampshire Town Hall. damages against the MFS Board and the members of the MFS Board, jointly and severally, at least $24,000 per occurrence, currently standing at $72,000, or so much more as proved at trial, and an order that the MFS Board and its members not discriminate against me;

142. On COUNT VI - MFS Dance Saturday, March 7, 2026 in Peterborough, New Hampshire, at least $24,000 per occurrence or so much more as proved at trial, and an order that the MFS Board and its members not discriminate against me;

143. On COUNT VII - Retaliation, at least $24,000 per occurrence or so much more as proved at trial, currently standing at $72,000 pending further amendment, and an order that the MFS Board and/or its members not discriminate against me;

144. Currently aggregating the statutory damages allowed by RSA 354-A:21(d), at least $384,000 or such further amount as proved at trial.

Respectfully Submitted,

____________________________

Laird J. Heal
8 Linden St.
Winchendon, MA 01475
(617-851-0232)
lairdheal@yahoo.com

Dated: March 19, 2026

Exhibit 1

# Exhibit 1

Case 1:26-cv-00263-JL Document 1-5 Filed 04/07/26 Page 48 of 70

## Monadnock Folklore Society's Post

Monadnock Folklore Society
February 17 at 10:55 AM ·

Join our all gender Morris team Firebird! Practices Thursday nights in Harrisville NH.

Richard Hart · Following
Feb 16 ·



Write a comment...

Exhibit 2

# Exhibit 2

Hi Laird (or do you prefer Bud?),
I need to connect with you by phone today. Would you be able to call me at 603-831-3287 at noon?
Thanks,
Peter Martel
MFS sound guy.

Exhibit 3

# Exhibit 3





# Jack In The Green

Public group · **253 members**

Join group Share

About Discussion Featured People Events Media Files

## About this group

JACK IN THE GREEN MORRIS MEN

Jack In The Green Morris Men are from the Monadnock Region of Southwest New Hampshire. We currently practice most Wednesday evenings, 7:30-9, in the Marlborough (NH!) School music room. If you would like to visit or join us for practice, leave us a message here to make sure we'll be dancing that week.

We perform dances in the style developed in the Cotswold Hills of England in the 19th century. Morris dancing dates back to the English courts of the 14th Century and may be considerably older than that. We specialize in the dances from the villages of Bledington and Bessels Leigh, but many of our dances are originals composed in the styles of those villages.

Our dancing season begins each year in late April at the New England Folk Festival and for 20 years we have been dancing the sun up on May Day Morning at the top of Pack Monadnock or at the Dublin School. We perform at festivals, street fairs, church celebrations and often at the spur of the moment outside pubs. We have danced throughout the Northeast and Canada, and even England.

Our "kit" consists of handmade pale green shirts, forest green breeches and vivid green shoelaces in our black shoes. We are also a singing group, specializing in old songs with rousing choruses about the sea, the changes in the season, and other timeless topics. **See less**

Public

Visible
Anyone can find this group.

History
Group created on December 9, 2008 **See more**

**Marlborough, New Hampshire**

## Members · 253



Fred, Lisa and Lucius have joined



Bill and Kris are admins.

**See all**

## Activity

No new posts today
2 in the last month

253 total members
No new members in the last week

Created
17 years ago

Exhibit 4

# Exhibit 4

Monadnock Folklore Society

## Search MFS Web Site

Search …

NAVIGATION

Home » Safety Policy at MFS Contra Dances

# Safety Policy at MFS Contra Dances

**Safety Policy**

Monadnock Folklore Society approved 09/07/25

**Introduction**

The Monadnock Folklore Society is dedicated to sponsoring events that are safe and enjoyable experiences for all attendees.

We encourage you to assist us by modeling actions that make you and those around you feel comfortable and safe, asking others about their needs and preferences, and being open and communicative about your own needs and preferences.

MFS is committed to doing the best we can. We are open to feedback on how we can continue to improve.This is a living document and will be updated as needed.

Contact a dance organizer, or send email to contrainfo@monadnockfolk.org to report a violation of this safety policy.

**Statement of Community Care**

Inclusion: We are welcoming to all, of any sex, gender identity and expression, age, sexual orientation, contra dance experience, disability, physical appearance, body size, race, ethnicity, or religion. We actively work to create inclusive spaces.

Consent: Anyone can say yes or no when asked to dance, with no reason needed for declining. It's fine to say no to a dance with one person and yes to someone


DIRECTIONS

Click Here for Directions to the Nelson Town Hall

Upcoming Events

MAR 22 — 2:00 pm - 4:00 pm — Shape Note Sing | Fourth Sundays

MAR 23 — 7:30 pm — Monday Night Dance

MAR 30 — 7:30 pm — Monday Night Dance

APR 4 — 8:00 pm - 11:00 pm — Peterborough First Saturday Contra Dance

APR 6 — 7:30 pm — Monday Night Dance

View Calendar

TICKETS

Tickets for MFS Events

DONATE

Donate to MFS

LINKS WE LIKE

- Community Social Dance in New Hampshire
- Country Dance and Song Society
- Firebird Morris
- Jack in the Green Morris Men
- Peterborough Folk Music Society
- The Folk Show on New Hampshire Public Radio (NHPR)
- Try Contra

else. Ask for consent before initiating a flourish such as a twirl or spin. We encourage clear communication between dancers about what feels safe and comfortable.

Accommodation: We encourage dancers to inform and ask each other about any personal limitations and to accommodate each other as needed, graciously.

Safety: We dance with the safety and comfort of other dancers in mind. There is a fine line between being playful and interfering with others. Each dancer has both the right and the responsibility to maintain control of their body. We do not lift another dancer off the floor. We do not dip people without their explicit permission. Note that it is possible to harm someone accidentally and it's up to each dancer to be aware of how others are reacting to their touch. Someone pulling away or saying "Ow" are as important to notice as being told specifically that you caused harm.

Respect: We respect each other. We believe that each attendee has something valuable to offer. We trust that all attendees will show mutual respect.

Roles: Anyone can dance with anyone. Some folks dance one role for a whole evening; others switch back and forth. We trust that the dancer coming toward us in the contra line is dancing the role they chose.

**Unacceptable Behaviors**

- Harassment: offensive behavior related to, but not limited to, discrimination on the basis of sex, gender identity and expression, age, sexual orientation, disability, physical appearance, body size, race, ethnicity, or religion.
- Unwanted or sexualized touching
- Insisting on partnering or continued asking after the other person has said “no”
- Insisting on flourishes after the other person has indicated they do not want to
- Lifting the other person such that their feet leave the floor
- Dancing while inebriated. Monadnock Folklore Society dances are smoke, drug, and alcohol-free.
- Stalking
- Hitting or other on-purpose physical harm
- Weapons are not permitted at our events. “Weapon” is defined as any firearm or other object that has been designed to inflict bodily harm or physical damage to property. Dance organizers have discretion to interpret this definition, and to ask an attendee to leave or remove the weapon from the property.
- Criminal activity, theft, vandalism

The MFS Board has the right to permanently ban someone from Monadnock Folklore Society events if the Board believes they pose a threat or harm to the community.

**Appeal Process**

A person who has raised a concern,, or the subject of a concern, may submit a request in writing for a review of any action taken to resolve a concern. The request should include any new information provided by any party that is relevant to the initial concern. If any agreements were made to resolve a concern, the person making the

appeal should detail how the agreements have been completed.

The organizers will attempt to resolve all reported concerns but do not promise specific outcomes.

**Additional Policies**

Photography

Photographers may be present at dances. Consent to be photographed or recorded is assumed. However, any attendee has the right to tell a photographer or dance organizer that they do not wish to be photographed, and their request must be honored.

WordPress Theme: Gambit by ThemeZee.

Exhibit 5

# Exhibit 5

# Monadnock Folklore Society

## Search MFS Web Site

Search ...

**NAVIGATION**

This event has passed.

# ☼ ☼ ☼ Lissa Schneckenburger Trio | Nelson Town Hall | February 27, 2026

February 27 @ 7:30 pm - 10:00 pm $20 – $25

**DIRECTIONS**

Click Here for Directions to the Nelson Town Hall

Upcoming Events

MAR 22 — 2:00 pm - 4:00 pm
☼ ☼ ☼ Shape Note Sing | Fourth Sundays

MAR 23 — 7:30 pm
☼ ☼ ☼ Monday Night Dance

MAR 30 — 7:30 pm
☼ ☼ ☼ Monday Night Dance

APR 4 — 8:00 pm - 11:00 pm
Peterborough First Saturday Contra Dance

APR 6 — 7:30 pm
☼ ☼ ☼ Monday Night Dance

View Calendar

**TICKETS**

**Tickets for MFS Events**

**DONATE**

**Donate to MFS**

**LINKS WE LIKE**

- Community Social Dance in New Hampshire
- Country Dance and Song Society
- Firebird Morris
- Jack in the Green Morris Men
- Peterborough Folk Music Society
- The Folk Show on New Hampshire Public Radio (NHPR)
- Try Contra





On Friday, February 27 join Lissa (fiddle and vocals), Rachel Aucoin (piano), and Samuel Foucher (accordion) for a night of traditional fiddling, folk songs, and more! Admission is $25/ $20 (in advance).

Over the last several decades Schneckenburger has made music that showcased everything from traditional New England dance tunes, to original songs inspired by her experience as a foster and adoptive parent. Her new album, Falling Forward, has blended her love of traditional music with her love of writing, in her first fiddle forward album in over a decade. Raised in a small town in Maine, Schneckenburger grew up with music. She began playing fiddle at the age of six, inspired by her parent's interest in folk music. In 2001 she graduated from the New England Conservatory of Music with a degree in Contemporary Improvisation. She has been writing, performing, and teaching music around the world ever since.

"To me, music creates community," Schneckenburger says. "Music is what people sing along to, dance to, fall in love to... music brings people together. These songs are part of all of us, and it's an honor to have had the chance to record them."

Rachel Aucoin – " I have been playing and writing music since I was a child growing up in Southern Maine and wrote my first song about my dog, Red, at the age of seven . Recently I have been

compelled to share my music and hopefully others will enjoy listening as much as I enjoy writing. My style is alternative rock, pop, instrumental rock, and singer/songwriter to folk."

Samuel Foucher – "I grew up in the Monadnock region of southern New Hampshire. My love for the accordion began at a new years' eve concert at a young, impressionable age. Bob McQuillen, Jimmy Keane and Jeremiah McLane were some of my mentors and sources of inspiration on this versatile instrument. Contra dancing was a frequent and beloved part of my childhood, and I have a deep appreciation for music and dance traditions of all sorts. I also love song, especially songs about the land and local history. While not playing my instrument, I enjoy woodworking and carpentry, riding bicycles, growing food, making useful and beautiful items, and anything that can serve as a catalyst for building community."

For Advance Reservations, Click Here.

DETAILS

Date:

February 27

Time:

7:30 pm - 10:

Cost:

$20 – $25

ORGANIZER




VENUE

Nelson Town

7 Nelson Cor

Nelson, 0345

States + Goo

Phone

Phone

603-76




WordPress Theme: Gambit by ThemeZee.

Exhibit 6

# Exhibit 6

Subject: Moratorium
From: DBG <dancingbrook@gmail.com>
Date: 2/23/26, 1:29 PM
To: Laird Heal <lairdheal@yahoo.com>

Dear Bud,

Thank you for speaking with me today. I wanted to reach out personally rather than simply send a letter, and I appreciate you taking the call. This follow-up is my written record of the most import parts of what we discussed.

I want to acknowledge again that this may be hard to sit with, and may feel unfair. That complexity is not lost on me, and this decision did not come without genuine care.

As I shared, after receiving and reviewing multiple concerns from community members — people who expressed feeling uncomfortable at our events — the board has voted to place an indefinite moratorium on your participation in all events we sponsor or organize, effective today. This includes our Monday night dances, the Peterborough Dance, our concerts, the Morris dance troop, and any other Monadnock Folklore Society events or activities.

This decision reflects the board's responsibility to maintain an environment where all participants feel safe and welcome, including you. I am not prepared at this time to define conditions or a timeline for revisiting it beyond an initial outreach within two to four weeks.

We ask that during this period you refrain from contacting other members of our dance community directly. If you wish to communicate with the board, please do so in writing through me — keeping communication through a single channel helps ensure clarity for everyone.

The board has committed to seeking guidance on this and broader community and cultural issues we are navigating, and that work is ongoing.

Your long history with this community is recognized. We did not arrive here without reflection. This moratorium is not a verdict on who you are.

Sincerely,

Peter Martel

Board Member

Monadnock Folklore Society

Exhibit 7

# Exhibit 7

Subject: JitG Participation
From: Bill Potter <billack@mac.com>
Date: 2/26/26, 6:16 PM
To: budheal508@gmail.com
CC: Owen Hale <owen.a.hale@gmail.com>, Carol Compton <cacompton2@gmail.com>

Bud,

Thanks for coming to "pub" last night and joining with us in what I'm sure was a difficult discussion. I know we all hope that you feel our conversation was productive. We just want to clarify that until we hear otherwise from the Board of the Monadnock Folklore Society, you will not be able to come to or participate in any Jack in the Green events including practices and after practice gatherings.

We've always felt that Jack in the Green is a welcoming group and I personally hope that this may lead to some growth for us all.

Best,

Bill Potter
Foreman, Jack in the Green